Mary Jo O'Neill, AZ Bar #005924
James P. Driscoll-MacEachron, AZ Bar #027828
William R. Hobson, AZ Bar #006887
Wasan A. Awad, AZ Bar #025352
Benjamin Price, IL Bar #6301926
**Equal Employment Opportunity**
**Commission, Phoenix District Office**
3300 N. Central Ave., Suite 690
Telephone: (602) 535-0412
Fax: (602) 640-5071
Email:  mary.oneill@eeoc.gov
        james.driscoll-maceachron@eeoc.gov
        william.hobson@eeoc.gov
        wasan.awad@eeoc.gov
        benjamin.price@eeoc.gov

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Equal Employment Opportunity Commission, | ) ) ) Case No.: |
| Plaintiff, | ) ) **COMPLAINT** |
| vs. | ) ) **(JURY DEMAND)** |
| Corizon Health, Inc., and | ) ) |
| Corizon LLC, | ) ) |
| Defendants. | ) ) ) |

## NATURE OF THE ACTION

This is an action brought by the Equal Employment Opportunities Commission ("EEOC" or "Commission") against Corizon Health, Inc. and Corizon LLC (collectively "Corizon") under Title I of the Americans with Disabilities Act of 1990 ("ADA"), as amended by the ADA Amendments Act of 2008, and Title I of the Civil Rights Act of 1991. The Commission brings this action to correct Corizon's nationwide unlawful employment policies and practices that discriminate on the basis of disability

and to provide appropriate relief for Charging Parties Elizabeth McCrehin, Ann Pogue, Nicole Moore, Linda Magnelli, Barbara McCormick, and other similarly situated qualified aggrieved individuals who were adversely affected by Corizon's unlawful actions. Corizon has discriminated against the Charging Parties and other qualified aggrieved individuals with disabilities by failing to provide them with reasonable accommodations. It also refused to engage in the interactive process with employees with disabilities who exhausted their leave under Corizon's 30-day medical leave policy or the Family and Medical Leave Act ("FMLA"). By doing so, Corizon implemented these policies and/or practices in a manner that served as a qualification standard and a method of administration that screened out or tended to screen out qualified individuals with disabilities. Corizon also discriminated against qualified persons with disabilities nationwide by implementing a policy and/or practice of requiring employees with a disability to be 100% healed or to be without any medical restrictions before they could return to work. Corizon then terminated them because of their disability and/or their need for accommodation. Finally, Corizon subjected some employees to a hostile work environment based on disability, failed to promote qualified individuals because of their disabilities, and retaliated against some of the Charging Parties and other qualified aggrieved individuals by among other things, disciplining them for leave used due to disabilities, and assigning them more strenuous job duties.

## JURISDICTION AND VENUE

1.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343 and 1345.

2.      This action is authorized and instituted pursuant to § 107(a) of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12117(a), which incorporates by reference §§ 706(f)(1) and (3) and 707 of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C.§§ 2000e-5(f)(1) and (3) and 2000e-6 and pursuant to § 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

3.      Employment practices alleged to be unlawful were and are now being

committed within the jurisdiction of the United States District Court for the District of Arizona.

## PARTIES

4.     The Commission is an agency of the United States of America charged with the administration, interpretation and enforcement of Title I of the ADA.

5.     The Commission is expressly authorized to bring this action by § 107(a) of the ADA, 42 U.S.C. § 12117(a), which incorporates by reference §§ 706(f)(1) and (3) and 707 of Title VII, 42 U.S.C. §§ 2000e-5(f)(1) and (3) and §2000e-6.

6.     At all relevant times, Corizon Health Inc., was a corporation formed in Delaware and its corporate headquarters is located in Tennessee. Corizon LLC is a Missouri corporation.

7.     Upon information and belief, Corizon Health Inc. is a manager of Corizon LLC and owns 20% or more of the capital of Corizon LLC.

8.     Corizon's employee handbook or "Employee Success Guide," which includes Corizon's FMLA leave policy and 30-day leave policy, lists two addresses on its cover page: it lists Corizon Health Inc.'s address in Tennessee as the corporate headquarters, and it lists Corizon LLC's Missouri address as its operations headquarters.

9.     Corizon's FMLA certification documents include both Corizon Health Inc. and Corizon LLC's addresses, *i.e.* the corporate headquarters address in Tennessee and the operational headquarters in Missouri.

10.     Joan Egan is a Senior Benefits Specialist for both Corizon Health Inc. and Corizon LLC. Joan Egan was involved in approving and denying leave requests for Charging Parties and other aggrieved individuals in this matter. She was involved in the decision to terminate the Charging Parties and other aggrieved individuals who were terminated because of their disabilities, and she sent discharge letters to all of them with her signature.

11.     Denetra Batey, a Human Resources official at Corizon's Corporate

Headquarters, was involved on more than one occasion in internal conversations with local Corizon supervisors, and Joan Egan regarding firing decisions and whether reasonable accommodations should be granted at the end of an employee's medical leave.

12.     Corizon Health Inc., and Corizon LLC, (collectively "Corizon") are national health care entities that provide healthcare services to jail and prison inmates at over 518 correctional facilities in twenty-six states, including Arizona.

13.     Both entities have been conducting business nationwide including in the State of Arizona and have continuously had more than 500 employees.

14.     At all relevant times, both corporations have been employers engaged in an industry affecting commerce under §§ 101(5) and 101(7) of the ADA, 42 U.S.C. §§ 12111(5) and (7).

15.     At all relevant times, both corporations have been a covered entity under §101(2) of the ADA, 42 U.S.C. § 12111(2).

## ADMINISTRATIVE PROCEDURES

16.     More than thirty days prior to the institution of this lawsuit Charging Parties Elizabeth McCrehin, Ann Pogue, Nicole Moore, Linda Magnelli, and Barbara McCormick filed charges with the Commission alleging violations of the ADA by Corizon.

17.     The Commission provided Corizon with notices of the charges of discrimination.

18.     The Commission investigated the charges of discrimination.

19.     On April 11, 2017, the Commission issued Letters of Determination concerning each of the referenced charges to Corizon finding reasonable cause to believe, based on evidence obtained during the investigations, that Corizon violated the ADA.

20.     On September 18, 2017, the Commission issued to Corizon a Notice of Failure of Conciliation advising Corizon that the Commission was unable to secure

from Corizon a conciliation agreement acceptable to the Commission.

21.     On May 4, 2018, the Commission issued Amended Letters of Determination to Corizon concerning each of the referenced charges.

22.     The Amended Letters of Determination invited Corizon to join with the Commission in informal methods of conciliation to endeavor to eliminate the unlawful employment practices and provide appropriate relief.

23.     On May 24, 2018, the Commission issued a Notice of Failure of Conciliation to Corizon advising it that the Commission was unable to secure a conciliation agreement acceptable to the Commission.

24.     All conditions precedent to the institution of this lawsuit have been fulfilled.

## **GENERAL ALLEGATIONS**

25.     Since at least April 1, 2012, Corizon has engaged in unlawful employment practices across the nation in violation of § 102 of Title I of the ADA, 42 U.S.C. § 12112.

26.     As a matter of policy or practice, Corizon would not approve modified job duties, allow more than twelve weeks of leave permitted by the FMLA, allow extended leave past an unpaid 30-day medical leave, or allow employees to return to work without being fully healed.

27.     Since at least April 1, 2012, Corizon has failed to provide reasonable accommodations to its employees with disabilities when the employee requests an accommodation or when Corizon is on notice that the employee needs an accommodation.

28.     Since at least April 1, 2012, Corizon has harassed qualified employees with disabilities because of their disabilities.

29.     Since at least April 1, 2012, Corizon has engaged in harassment of some of its qualified employees with disabilities because of their need for reasonable accommodations.

30.     Since at least April 1, 2012, Corizon has retaliated against qualified employees with disabilities.

31.     Since at least April 1, 2012, Corizon has failed to promote qualified aggrieved individuals because of their disabilities or need for reasonable accommodations.

32.     Since at least April 1, 2012, Corizon has enforced a rigid and inflexible 30-day medical leave policy.

33.     Pursuant to Corizon's policy, only full-time, non-probationary employees are eligible for medical leave and the leave cannot exceed 30 days.

34.     Pursuant to Corizon's policy, if an employee does not use the full 30 days of the medical leave, the remaining days are forfeited.

35.     Pursuant to Corizon's policy, employees in need of medical leave are expected to complete "Request for Leave of Absence" and "Certification of Healthcare Provider" forms and forward them to the Human Resources department who will then either approve or deny the requests.

36.     Pursuant to Corizon's policy, employees who do not return at the end of their approved FMLA leave and/or the unpaid 30-day medical leave are either terminated and/or Corizon considers them to have voluntarily resigned.

37.     Corizon does not engage in an interactive process at the end of an employee's medical leave. Instead, Corizon terminates its employees with disabilities when the employees are unable to return to work after their unpaid 30-day medical leave and/or when their FMLA leave entitlement has been exhausted.

38.     Since at least April 1, 2012, Corizon has implemented a 100% fully healed return to work rule.

39.     Since at least April 1, 2012, Corizon has applied its rigid and inflexible leave policies and its 100% fully healed return to work rule in a manner that made them standards and methods of administration that have the effect of discriminating against employees on the basis of disability.

40.     Since at least April 1, 2012, Corizon has applied its rigid and inflexible leave policies and its 100% fully healed return to work rule in a manner that made them qualification standards or other selection criteria that screen out or tend to screen out individuals with disabilities.

41.     Corizon's application of its rigid and inflexible leave policies and its 100% fully healed return to work rule is not job-related and consistent with business necessity, in violation of 42 U.S.C. §§ 12112(a) 12112(b)(3)(A) and 12112(b)(6).

42.     Each individual for whom the Commission seeks relief in this action is a qualified individual with a disability under §§ 3 and 101(8) of the ADA, 42 U.S.C. §§ 12102 and 12111(8).

**Charging Party Ann Pogue**

43.     Corizon hired Charging Party Ann Pogue at its Phoenix, Arizona facility in March 2013.

44.     Ms. Pogue was a Mental Health Technician or a "Psych Tech" at Corizon.

45.     Ms. Pogue had medical conditions that constituted qualifying disabilities, including degenerative disk and joint disease or spondylosis, Sjorgrens syndrome, asthma, and herniated disks due to a neck injury suffered while on the job in 2006.

46.     Ms. Pogue experienced severe pain due to her neck injury and in 2014 the pain resulted in limited ability to use her right arm without pain.

47.     Ms. Pogue had disabilities and a record of disabilities that substantially limited, at a minimum, the major life activities of walking, lifting, standing, sleeping, breathing, working and which also substantially limited the operation of her musculoskeletal and respiratory systems.

48.     Ms. Pogue satisfactorily performed the essential functions of her job during the time she worked at Corizon.

49.     Ms. Pogue is a qualified individual with a disability under §§ 3 and 101(8) of the ADA, 42 U.S.C. §§ 12102 and 12111(8).

50.     Corizon subjected Ms. Pogue to adverse employment actions because of

her disability and/or because of her need for reasonable accommodation, including but not limited to harassment, increasing her workload, and terminating her.

51. Ms. Pogue was tasked with organizing files in a medium security facility at Corizon.

52. She was assigned this job duty because of her excellent skills and ability to organize the disorderly files.

53. She was able to perform these job duties despite her medical conditions.

54. While at Corizon, Ms. Pogue repeatedly notified her supervisors of her need for reasonable accommodations.

55. Ms. Pogue's daily shift was from 7 a.m. to 3 p.m. and so she was able to get medical care, such as physical therapy, and trigger point injections after her shifts were over.

56. For this reason, she did not have to request time off from work in order to get medical care.

57. Corizon supervisors sought to move Ms. Pogue to a different facility. Ms. Pogue informed them that the facility she was in currently was ideal for her because of her medical conditions and because she didn't have to deal with stairs which would impact her back.

58. Her supervisors informed her that she was going to have to deal with it and she would have to be moved to the other facility.

59. Ms. Pogue then asked for a light duty position, regardless of what facility it was in, but her supervisors denied her request.

60. Ms. Pogue was moved to the Baker facility which was in a different part of the prison block. The Baker facility was a maximum-security unit.

61. Air fresheners and paint were regularly used at the Baker facility.

62. The chemicals in the air fresheners and paint exacerbated Ms. Pogue's asthma.

63. Ms. Pogue asked her supervisor to move her to a different facility because

of her discomfort due to the air fresheners and paint, but her supervisor refused to move her. Instead, he told her to deal with it, and he did not consider any other accommodations.

64.     In July 2014, Corizon changed her shift and required her to report to work from 8 a.m. to 5 p.m.

65.     Due to her shift change, Ms. Pogue could no longer schedule her medical appointments after work.

66.     Corizon officials informed Ms. Pogue that if she needed to go to the doctor she would have to put in for FMLA leave.

67.     Corizon officials regularly pestered her about her medical appointments.

68.     Ms. Pogue informed them that if they would move her back to her original schedule, she would be able to see her health care providers without having to put in for leave.

69.     Ms. Pogue's supervisors, however, refused to move her back to her old schedule.

70.     Ms. Pogue is aware of three other employees who were permitted to keep their old schedules of 7 a.m. to 3 p.m. due to being in school or because they needed to pick their kids up from school.

71.     Corizon required Ms. Pogue to conduct 3 p.m. classes for inmates. The classes included anger management, cognitive behavior, and meditation.

72.     Her supervisors refused to assign another psych tech to the 3 p.m. slot. In fact, her supervisors told her that if she put in for FMLA leave for the 3 p.m. slot they would deny the leave.

73.     Nor did her supervisors approve her attempt to switch classes with another psych tech.

74.     Ms. Pogue also requested light-duty or part-time positions, but Corizon denied her requests.

75.     Instead, Corizon repeatedly detailed Ms. Pogue to work assignments with

increased job duties and burdens, including more standing, and walking longer distances. These duties increased her back pain and caused her to need more medical treatment.

76.     In December 2014, Ms. Pogue submitted an FMLA request requesting leave until March 2015.

77.     Corizon approved her December FMLA request.

78.     In February 2015, Ms. Pogue submitted a request for an extension of leave requesting leave until August 2015 for surgery and recovery.

79.     On March 2, 2015 Corizon's Leave Specialist, Joan Egan, informed Ms. Pogue by certified mail that her FMLA leave was exhausted on March 1, 2015.

80.     Joan Egan informed Ms. Pogue that since she was not 100% healed she could not return to work.

81.     Ms. Pogue requested that Corizon headquarters provide reassignment to a different job or light duty, but Corizon denied her request.

82.     Corizon informed Ms. Pogue that they do not accommodate modified duty requests.

83.     Ms. Pogue contacted her supervisors, who confirmed that she could not return to work until she was 100% healed.

84.     Corizon did not engage with Ms. Pogue in the interactive process or consider any reasonable accommodations, including but not limited to a change in her shift, light duty positions, a transfer to a different facility, and an extended leave as a potential reasonable accommodation.

85.     As a result, Corizon "resigned" Ms. Pogue from her position on March 2, 2015.

86.     Corizon terminated Ms. Pogue.

**Charging Party Elizabeth McCrehin**

87.     Charging Party Elizabeth McCrehin was employed by Corizon's two predecessors in Florence, Arizona, the Arizona Department of Corrections and

Wexford.

88.    She was a Psychiatric Nurse when she worked for the Arizona Department of Corrections.

89.    She was then a Nursing Supervisor for Wexford at the same facility.

90.    Ms. McCrehin continued to be a Nursing Supervisor when Corizon took over operations at the Florence facility in March 2013.

91.    Ms. McCrehin had a foot impairment, and Ms. McCrehin's physician recommended immediate surgery before further damage occurred to her foot.

92.    Ms. McCrehin suffered complications during her surgery which resulted in a longer recovery period.

93.    Based on Ms. McCrehin's impairment and surgery complications, Ms. McCrehin had a disability and a record of a disability that substantially limited, at a minimum, her major life activities of walking, standing, driving, lifting, climbing and that substantially limited the operation of her musculoskeletal system.

94.    Ms. McCrehin satisfactorily performed the essential functions of her job during the time she worked at Corizon.

95.    Ms. McCrehin is a qualified individual with a disability under §§ 3and 101(8) of the ADA, 42 U.S.C. §§ 12102 and 12111(8).

96.    Corizon subjected Ms. McCrehin to adverse employment actions such as terminating her because of her disability and her need for a reasonable accommodation.

97.    In or around July 2013, Ms. McCrehin notified Corizon's Facility Administrator, Robert Parkinson, of her need for time off so that she could have surgery performed on her foot.

98.    Ms. McCrehin submitted three documents indicating she needed to be out for a medical condition: specifically, a doctor's note, a Certification of Health Care Provider, and a Request for Leave of Absence.

99.    Corizon was on notice of Ms. McCrehin's need for surgery and a subsequent recovery period of about six to eight weeks.

100.    Corizon was aware of Ms. McCrehin's need for a reasonable accommodation.

101.    On July 11, 2013, one day before her surgery, Corizon told Ms. McCrehin she did not qualify for FMLA leave because Corizon had recently taken over the facility. Corizon instead considered her request to be a request for a 30-day medical leave to end August 10, 2013.

102.    Joan Egan submitted a memo to Ms. McCrehin's supervisor Parkinson approving her 30-day medical leave and indicated that Ms. McCrehin must return to work by August 11, 2013.

103.    The memo further provided that if Ms. McCrehin failed to return at the end of her approved leave it would result in a "medical termination."

104.    Ms. McCrehin suffered a broken bone in her toe during her surgery, which resulted in a longer recovery period.

105.    Her doctor indicated that she would be in a boot for eight to twelve weeks, and should not put weight on her foot.

106.    On August 5, 2013, five days before her 30-day medical leave was set to expire, and as requested by Joan Egan, Ms. McCrehin submitted a "Certification of Health Care Provider" to Corizon.

107.    In it, Ms. McCrehin's doctor indicated that Ms. McCrehin may be able to return to work on October 14, 2013.

108.    Despite this documentation, and despite the fact that Ms. McCrehin's doctor indicated that Ms. McCrehin's leave needed to be extended, Ms. McCrehin was not granted an extended leave of absence.

109.    Corizon officials determined that Ms. McCrehin should not be granted an extension to her 30-day medical leave.

110.    Ms. McCrehin's supervisor Parkinson informed headquarters that he has never had any employee out for more than two weeks and he recommended that Corizon let Ms. McCrehin go.

111.    Denetra Batey, a human resource official at Corizon's corporate headquarters, suggested that once Ms. McCrehin has been released from medical care she could reapply for reemployment, and she informed Parkinson that:

> "You will also need to keep in mind is [sic] that when you have a similar issue come up we will have to use this situation as the precedence for others who may need to be out on a leave longer than 30 days."

112.    On or around August 16, 2013, Joan Egan, Corizon's Senior Benefits Specialist, notified Ms. McCrehin via certified mail that Corizon had terminated her employment due to Ms. McCrehin having exhausted her 30-day medical leave under Corizon's Policy.

113.    Joan Egan's letter indicated that Corizon had received Ms. McCrehin's medical certification paperwork from her physician and they were aware that her release date was October 14, 2013.

114.    Joan Egan stated in her letter to Ms. McCrehin that Ms. McCrehin was terminated for "health reasons."

115.    Corizon did not engage with Ms. McCrehin in the interactive process or consider any reasonable accommodations, including but not limited to extended leave as a potential reasonable accommodation.

116.    Corizon terminated Ms. McCrehin.

**Charging Party Nicole Moore**

117.    Corizon hired Charging Party Nicole Moore as a Registered Nurse in its Goodyear, Arizona facility in March 2013.

118.    Ms. Moore has Inappropriate Sinus Tachycardia, a cardiac condition.

119.    Ms. Moore's medical condition causes heart palpitations, dizziness, and fatigue.

120.    Ms. Moore had a disability and a record of a disability that substantially limits, at a minimum, the major life activities of walking, standing, thinking, concentrating, and substantially limited the operation of her cardiovascular system.

121.    Ms. Moore satisfactorily performed the essential functions of her job during the time she worked at Corizon.

122.    Ms. Moore is a qualified individual with a disability under §§ 3 and 101(8) of the ADA, 42 U.S.C. §§ 12102 and 12111(8).

123.    Corizon subjected Ms. Moore to adverse employment actions, including but not limited to harassment, denying her a promotion, discipline, failing to provide her with reasonable accommodations, and constructively discharging her because of her disability and/or her need for reasonable accommodation.

124.    In or around July 2013, while Ms. Moore was at work her heart started racing and she did not feel well.

125.    Ms. Moore asked for an EKG to be administered, and, after the EKG was completed, she was told that someone needed to drive her to the hospital immediately.

126.    Ms. Moore informed the Assistant Director of Nursing, Leslie Wincek, who in turn asked another nurse to drive Ms. Moore to the hospital.

127.    Ms. Moore later updated Ms. Wincek of her medical progress and medical diagnosis.

128.    Ms. Moore subsequently had another medical episode at work and was taken to urgent care by a fellow employee.

129.    Due to her disability, Ms. Moore needed to take time off from work intermittently for treatment and respite.

130.    Ms. Moore was not informed by any of her supervisors that she had the right to any form of leave.

131.    On or around March 2014, Corizon's Assistant Facility Health Administrator, L. Miller, informed staff at a meeting that although some employees had medical conditions they still needed to come to work.

132.    When L. Miller made the above statement at a staff meeting, she looked directly at Ms. Moore.

133.    Miller made the comment in front of the majority of Ms. Moore's

coworkers.

134.    Ms. Moore felt very uncomfortable, as if she had been "outed" as an individual with a medical condition.

135.    Corizon allotted time and attendance points to Ms. Moore's leave related to her medical condition, including having to leave early to go to the emergency room, being on leave for a medical procedure, and not feeling well after a procedure.

136.    Ms. Moore had previously expressed interest in an open supervisor position to the Facility Health Administrator, Mr. Anthony Coleman.

137.    In mid-May 2014, Ms. Moore was called into a meeting with both L. Miller and Leslie Wincek. They informed her that, while they were aware of Ms. Moore's medical condition, Ms. Moore would be written up for time and attendance under their progressive discipline policy.

138.    Ms. Moore noticed discrepancies in the dates on the write-up and refused to sign the document.

139.    At a second meeting with Mr. Coleman and Ms. Miller, Mr. Coleman told Ms. Moore she was in strong contention for the supervisor position she had put in for, but he had to take her medical condition into consideration when making his decision and he believed a supervisory position would be very stressful.

140.    Mr. Coleman informed her he was taking her out of consideration for the supervisor position.

141.    At the same meeting, time and attendance was again brought up and Ms. Moore was again handed a write-up to sign.

142.    Ms. Moore again noticed discrepancies in the dates on the write-up and refused to sign the document.

143.    Subsequently, Corizon promoted a new employee who was still on probation to the supervisor position instead of Ms. Moore.

144.    On or around May 31, 2014, Mr. Coleman called Ms. Moore into another meeting and again admonished her for her time and attendance.

145.   In response to her discipline for leave due to her disability, Ms. Moore showed Mr. Coleman her write-ups and told him that she found it sad that she was getting in trouble because she had an issue with her heart.

146.   Because of this treatment, Ms. Moore called Corizon's corporate office to file an EEO complaint because she was consistently being given write-ups due to her disability and her need for a reasonable accommodation.

147.   After Ms. Moore called corporate headquarters, Mr. Coleman again called her into a meeting to discuss her time and attendance. This time Ms. Moore asked for a witness to be present. Mr. Coleman became angry and told Ms. Moore to turn in her ID and asked another employee to escort her off the facility in front of coworkers, correction officers and prison inmates.

148.   Ms. Moore called corporate headquarters again to complain and she was contacted by an HR representative who informed her that, despite the way in which she had been walked out, and required to turn in her ID, she was not terminated and Ms. Moore was allowed to return to work. Mr. Coleman called her and told her to return to work.

149.   However, after Ms. Moore was allowed to return to work after being terminated because she complained to corporate, she was then retaliated against and ostracized at work. Mr. Coleman and Ms. Miller would not speak to her and ignored her even when she was in the same group as other employees with whom they spoke. Her coworkers regularly asked her if she had been terminated when she was walked off the facility and/or whether she would be terminated. Ms. Moore was always worried that she would be called into another meeting related to her attendance, she felt like she was walking on eggshells, and she was constantly worried that she would be fired.

150.   Her negative working conditions impacted her sleep and caused her a great deal of stress and anxiety.

151.   Due to the stress she was feeling from her work experience she felt she could no longer work at Corizon and ended her employment with them in October

2014.

152.    Ms. Moore was constructively discharged by Corizon.

**Charging Party Linda Magnelli**

153.    Charging Party Linda Magnelli worked for Corizon's predecessor as a staff Psychology Associate or Counselor. Corizon took over the facility in Florence, Arizona in March 2013.

154.    Ms. Magnelli retained the same position at Corizon starting in March 2013.

155.    Ms. Magnelli has rheumatoid arthritis and osteoarthritis, neuropathy, fibromyalgia, cellulitis, Achilles tendonitis, anxiety, and depression.

156.    Ms. Magnelli has disabilities and a record of disabilities which substantially limit at a minimum, her major life activities of walking, sitting, standing, lifting, sleeping, concentrating, and which substantially limited at a minimum the operation of her musculoskeletal and neurological systems.

157.    Ms. Magnelli satisfactorily performed the essential functions of her job during the time she worked at Corizon.

158.    Ms. Magnelli is a qualified individual with a disability under §§ 3 and 101(8) of the ADA, 42 U.S.C. §§ 12102 and 12111(8).

159.    Corizon subjected Ms. Magnelli to adverse employment actions, including but not limited to harassment, threats of discipline or discharge, and eventual termination because of her disability and/or her need for reasonable accommodation.

160.    The Deputy Warden at the Department of Correction had previously provided Ms. Magnelli with a reasonable accommodation for her medical needs caused by the rheumatoid arthritis.

161.    Specifically, she requested and was permitted the use of a cane to ease her walking.

162.    When Ms. Magnelli interviewed for a position at Corizon, she went to the interview with a cane.

163.    Later on, during a meeting at Corizon with the same woman from headquarters who had previously interviewed her, the woman pointed at the cane and asked how long she had been using the cane.

164.    Ms. Magnelli informed her that she had been using the cane all along.

165.    Subsequently, during a staff meeting, Ms. Magnelli's supervisor, Dr. Mertens told Ms. Magnelli in front of her coworkers that he wished that someone had asked him whether she could use her cane, because he would not have allowed it.

166.    Due to her tendonitis, while Ms. Magnelli also needed the use a rolling walker to balance the strain on the injured tendons, she used a cane much more frequently than the walker.

167.    In June and July of 2013, Ms. Magnelli was hospitalized.

168.    Ms. Magnelli used paid time off ("PTO") for her medical leave.

169.    While she was in the hospital, Dr. Mertens required Ms. Magnelli to call in daily by 6 a.m. to report her status and provide documentation regarding her leave even though HR did not require this of her as she was using paid time off.

170.    However, Dr. Mertens insisted that she follow his orders, or she would face disciplinary action.

171.    When she returned to work on or around July 10, 2013, Dr. Mertens required that she indicate on her PTO paperwork why she was out on leave, which meant that she needed to identify that she was out on sick leave and in the hospital.

172.    Ms. Magnelli complained to HR about Ms. Magnelli's requirements. HR informed her that she was not required to follow his instructions because she was out on PTO.

173.    After her complaints and upon Ms. Magnelli's return to work, Dr. Mertens increased Ms. Magnelli's job duties, requiring her to now work at the Cook facility twice a week in addition to her regular work at the Meadows facility.

174.    The increase in work required Ms. Magnelli to work in different yards, which meant Ms. Magnelli needed to walk more, and across longer distances despite

her known disabilities.

175.    The increase in her job duties also resulted in more stress which impacted her disabilities including exacerbating her anxiety and depression.

176.    Ms. Magnelli told Dr. Mertens that there was not enough time in the day to complete all the functions he was assigning her, but Dr. Mertens told her he didn't care if it took her until midnight.

177.    Ms. Magnelli asked for help to go over to the next yard that had been assigned to her because it was difficult for her to walk there.

178.    She asked if she could use a golf cart that was available.

179.    Dr. Mertens did not accommodate her request even though Corizon had golf carts available that could have been used to drive her to the other facility.

180.    Instead Dr. Mertens told her that she should have thought about that when she started working there.

181.    The increased work load and walking increased her anxiety and depression.

182.    In August 2013, due to the strain on her body from the extra work, Ms. Magnelli could no longer walk on her right foot because of the pain.

183.    She called all her supervisors to let them know that she needed to go to urgent care.

184.    None of her supervisors answered their phones and she went up the chain of command and left voicemails for all of them letting them know she needed to go to urgent care across the street.

185.    Ms. Magnelli put in for PTO for the few hours she was at urgent care.

186.    When she returned to work the following day, Dr. Mertens informed Ms. Magnelli that he could terminate her for leaving her post.

187.    Ms. Magnelli informed him that she had followed protocol and attempted to inform all of her supervisors before leaving to seek medical attention.

188.    When Ms. Magnelli left to go to urgent care, there were still nurses

available at the workplace.

189.   Ms. Magnelli complained to HR, who informed her that Dr. Mertens did not have the authority to terminate her.

190.   After Ms. Magnelli complained to HR, Dr. Mertens again increased her workload. Ms. Magnelli now had to work at both the Meadows and Cook facilities every day as opposed to working at Cook twice a week.

191.   Around this time, in November 2013, Ms. Magnelli saw a counselor due to the increased workload and she was told that her health was in a very severe state due to the stress and that she needed to take medical leave.

192.   On or around November 22, 2013, Ms. Magnelli spoke to her HR representative and asked for time off due to her medical condition.

193.   HR approved her taking time off. Corizon knew of Ms. Magnellis disability and her need for accommodation.

194.   Because Corizon officials did not consider Ms. Magnelli eligible for FMLA, Corizon HR officials at Corizon headquarters assigned her a 30-day medical leave set to expire on December 22, 2013.

195.   Ms. Magnelli was required to report to work on December 23, 2103.

196.   On December 13, 2013 one of Ms. Magnelli's physicians submitted a "Certification of Health Care Provider" document to Corizon explaining Ms. Magnelli's medical conditions and indicating that Ms. Magnelli would not be able to return to work until May 22, 2014.

197.   Starting on or around December 16, 2013, Corizon Corporate Human Resource and Leave officials communicated with each other and agreed that they would not extend her 30-day leave per Corizon policy.

198.   Corizon officials stated that they were concerned about setting a precedent of extending leave past the 30-day medical leave permitted by their policy.

199.   On December 17, 2013, Ms. Magnelli, in communication with Corizon officials, indicated that she was not sure that she would be able to return on December

23, 2013 and asked for extended leave.

200. On December 18, 2013, Ms. Magnelli informed Corizon that she would return to work on December 23, 2013 because she was trying to get back to work.

201. On December 19, 2013, Ms. Magnelli's physician submitted a "Return to Work Restrictions" document to Corizon indicating that Ms. Magnelli may be able to return to work on December 23, 2013 but with some restrictions.

202. The doctor's restrictions included responding to emergencies, lifting 10 to 35 pounds from a table, bending, climbing stairs, or reaching. Ms. Magnelli sought to work with the restrictions.

203. She was restricted to three hours of sitting, standing, and walking respectively.

204. On the same date, December 19, 2013, Joan Egan sent an email to a Corizon official indicating that she needs to obtain paperwork from Ms. Magnelli indicating that she can return to work full duty, preferably at least five days before her leave is set to expire.

205. However, her leave was set to expire in three days, on December 22, 2013.

206. Corizon issued a letter to Ms. Magnelli on December 26, 2013 informing her that her employment was terminated on December 23, 2013, thirty days after she went out on medical leave and without consideration of any possible and available accommodations.

207. Corizon specifically informed Ms. Magnelli in their termination letter that Corizon terminated her for "health reasons."

208. Corizon terminated Ms. Magnelli.

**Charging Party Barbara McCormick**

209. Corizon hired Charging Party Barbara McCormick as a Licensed Practical Nurse ("LPN") in its Kuna, Idaho facility in August 2014.

210. Ms. McCormick has Spinal Stenosis which is a back impairment.

211.  Ms. McCormick has a disability and a record of a disability that substantially limits her major life activities, including but not limited to bending, lifting, climbing, squatting, working, and which substantially limited at a minimum the operation of her musculoskeletal system.

212.  Ms. McCormick satisfactorily performed the essential functions of her job during the time she worked at Corizon.

213.  Ms. McCormick is a qualified individual with a disability under §§ 3 and 101(8) of the ADA, 42 U.S.C. §§ 12102 and 12111(8).

214.  Corizon subjected Ms. McCormick to adverse employment actions, including but not limited to termination because of her disability and/or her need for reasonable accommodation.

215.  In or around January 2015, Ms. McCormick informed her supervisor, the Director of Nursing, that she would need time off in February 2015 because she needed surgery for her back impairment.

216.  Corizon knew of Ms. McCormick's disability and her need for accommodation.

217.  Corizon deemed Ms. McCormick to be ineligible for FMLA leave.

218.  Ms. McCormick was granted leave under Corizon's 30-day leave policy.

219.  Ms. McCormick's medical leave began on or around February 27, 2015, and, based on Corizon's leave policies, her leave would expire on March 29 and her return to work date could be no later than March 30, 2015.

220.  On March 19, 2015 Ms. McCormick's doctor sent a letter to Corizon stating that, during her recovery from surgery, Ms. McCormick would be unable to push, pull, or lift until April 7, 2015.

221.  On April 1, 2015, Ms. McCormick's doctor sent a Return to Work Restrictions document to Corizon.

222.  Her restrictions would be in effect until May 19, 2015 and included avoiding lifting more than 20 to 25 pounds, pushing only up to 25 pounds, and she

could not perform repetitive bending, frequent stair climbing, or repetitive squatting.

223.   Her restrictions included the inability to stand or walk for over three hours and up to five hours.

224.   In the April 1, 2015 letter, her doctor also indicated that she could work four hours a day for two weeks and then six hours a day for the next two weeks and finally she could return to work full time.

225.   On April 6, 2015, Joan Egan left a voice mail message for Ms. McCormick, informing her that her reasonable accommodations requests were denied and that she was discharged because Corizon could not extend her medical leave.

226.   After this notification, Corizon changed course and allowed Ms. McCormick to take personal leave until April 22, 2015.

227.   On April 30, 2015 Ms. McCormick's doctor submitted additional return to work restrictions indicating that Ms. McCormick could return to work on May 5, 2015 and that she would be able to work six hours a day for three weeks and then full time.

228.   The doctor also stated that until she could work full time, she had to avoid lifting more than 20 to 25 pounds and she could push and pull a maximum of 25 pounds and had to avoid frequent stair climbing, repetitive bending or squatting.

229.   On May 5, 2015, the same day she was set to return to work, Corizon sent her a notice through certified mail informing her that her leave, including her personal leave, had expired, and she was "resigned" from her position. She was told by Corizon that she could reapply with Corizon once she was released to full duty.

230.   Corizon terminated Ms. McCormick.

### FIRST CLAIM FOR RELIEF

**Failure to Provide Reasonable Accommodation**

**42 U.S.C. §§ 12112(a) and (b)(5)(A)**

231.   The Commission reasserts and incorporates by reference all of the foregoing paragraphs.

232. Since April 1, 2012, Corizon has violated the ADA by denying its employees reasonable accommodations in violation of 42 U.S.C. §§ 12112(a) and (b)(5)(A).

233. Charging Parties Elizabeth McCrehin, Ann Pogue, Nicole Moore, Linda Magnelli, Barbara McCormick and other similarly situated aggrieved individuals are qualified individuals with disabilities.

234. Corizon was aware of the physical limitations of Charging Parties McCrehin, Pogue, Moore, Magnelli, McCormick and other similarly situated qualified aggrieved individuals due to their disabilities.

235. Ms. McCrehin requested reasonable accommodations, including extended leave, in July and August 2013.

236. Corizon denied Ms. McCrehin's request.

237. Ms. Pogue requested several reasonable accommodations, including but not limited to moving her shift back to its 7 a.m. to 3 p.m. slot, not being moved to a different facility that required the use of stairs, being moved to a facility that did not use paint or air fresheners, light-duty or part-time positions, and extended leave.

238. Corizon denied all of Ms. Pogue's requests for reasonable accommodations.

239. Ms. Moore requested intermittent leave to receive medical treatment and for respite for her disability.

240. Corizon denied Ms. Moore's requests.

241. Ms. Magnelli requested reasonable accommodations, such as the use of a golf cart to transport her from one facility to another and extended leave.

242. Corizon denied all of Ms. Magnelli's requests.

243. Ms. McCormick requested reasonable accommodations, including light-duty accommodations as specified by her doctor in his return to work forms.

244. Corizon denied Ms. McCormick's request.

245. Corizon failed to engage in the interactive process with Charging Parties

McCrehin, Pogue, Moore, Magnelli, McCormick, or other similarly situated qualified aggrieved individuals with disabilities to identify the precise limitations resulting from their disabilities and potential accommodations that could overcome those limitations.

246.   Despite Corizon's knowledge of the need for reasonable accommodations, Corizon failed to make reasonable accommodations for the physical and mental limitations of Charging Parties McCrehin, Pogue, Moore, Magnelli, McCormick and other similarly situated qualified aggrieved individuals with disabilities.

247.   The unlawful employment practices complained of in the foregoing paragraphs above are intentional.

248.   The unlawful employment practices complained of in the foregoing paragraphs were, and are, done with malice or with reckless indifference to the federally protected rights of Charging Parties McCrehin, Pogue, Moore, Magnelli, McCormick and other similarly situated qualified aggrieved individuals with disabilities.

249.   The unlawful employment practices complained of in the foregoing paragraphs are continuous and ongoing.

**<u>SECOND CLAIM FOR RELIEF</u>**

**Discriminatory and Constructive Discharge**

**42 U.S.C. §§ 12112(a) and (b)(5)(B)**

250.   The Commission reasserts and incorporates by reference all of the foregoing paragraphs.

251.   Since April 1, 2012, Corizon has violated 42 U.S.C. §§ 12112(a) and (b)(5)(B) of the ADA by discharging its employees either because of their disabilities and/or because of their need for a reasonable accommodation, including their need for extended leave and and/or because they did not have a full medical release and could not return to work 100% healed.

252.   Charging Parties McCrehin, Pogue, Moore, Magnelli, McCormick and

other aggrieved individuals are qualified individuals with disabilities.

253.    Corizon discharged or constructively discharged Charging Parties McCrehin, Pogue, Moore, Magnelli, McCormick, and other qualified aggrieved individuals because of their disabilities and/or because they had physical or mental limitations requiring reasonable accommodation.

254.    Corizon discharged Charging Party Pogue after her FMLA leave expired.

255.    Corizon informed Ms. Pogue that they would not provide her with light duty and because she was not 100% healed, she could not return to work.

256.    Corizon discharged Charging Party McCrehin after her 30-day medical leave expired even though they knew she needed a leave extension. Corizon informed Ms. McCrehin that she was discharged for "health reasons."

257.    Ms. Moore was treated negatively by her supervisors, denied a promotion and walked off the facility at one point because she refused to sign a discipline form for time and attendance related to medically necessary leave.

258.    Ms. Moore constructively discharged her employment with Corizon because she was consistently harassed and disciplined due to her disability, and her use of leave for medical conditions, and also because of the stress, anxiety, and humiliation she was exposed to at the workplace due to her disability.

259.    Corizon discharged Charging Party Magnelli after her 30-day medical leave expired. Corizon informed Ms. Magnelli they had discharged her due to "health reasons."

260.    Corizon discharged Charging Party McCormick because her leave expired and because she could not return to work without medical restrictions.

261.    The practices complained of in the paragraphs above deprived Charging Parties McCrehin, Pogue, Moore, Magnelli, McCormick and other qualified aggrieved individuals of equal employment opportunities and otherwise adversely affected their status as employees because of their disabilities.

262.    The unlawful employment practices complained of in the foregoing

paragraphs were and are intentional.

263.    The unlawful employment practices complained of in the foregoing paragraphs were and are done with malice or with reckless indifference to the federally protected rights of Charging Parties McCrehin, Pogue, Moore, Magnelli, McCormick, and the other qualified aggrieved individuals.

264.    The unlawful employment practices complained of in the foregoing paragraphs are continuous and ongoing.

**THIRD CLAIM FOR RELIEF**

**Discriminatory Failure to Promote**

**42 U.S.C. §§ 12112(a) and (b)(5)(B)**

265.    The Commission reasserts and incorporates by reference all of the foregoing paragraphs.

266.    Upon information and belief, since April 1, 2012, Corizon has violated 42 U.S.C. §§ 12112(a) and (b)(5)(B) of the ADA by denying its employees promotions or advancement in employment either because of their disabilities and/or because of their need for a reasonable accommodation.

267.    Charging Party Moore and other aggrieved individuals are qualified individuals with disabilities who were not promoted because of their disabilities.

268.    Corizon acting through Ms. Moore's assigned supervisor, Mr. Coleman, removed Ms. Moore from consideration for a promotion to supervisor because of her disabilities and/or because Ms. Moore's need for a reasonable accommodation.

269.    The practices complained of in the paragraphs above deprived Ms. Moore and other aggrieved individuals of equal employment opportunities and otherwise adversely affect their status as employees because of their disabilities.

270.    The unlawful employment practices complained of in the foregoing paragraphs were and are intentional.

271.    The unlawful employment practices complained of in the foregoing paragraphs were and are done with malice or with reckless indifference to the federally

protected rights of Ms. Moore and the other aggrieved individuals.

272.    The unlawful employment practices complained of in the foregoing paragraphs are continuous and ongoing.

### FOURTH CLAIM FOR RELIEF

### Retaliation

### Section 503 of the ADA, 42 U.S.C. § 12203

273.    The Commission reasserts and incorporates by reference all of the foregoing paragraphs.

274.    Since at least April 1, 2012, Corizon has engaged in unlawful employment practices, in violation of Section 503 of the ADA, 42 U.S.C. § 12203, by retaliating against Charging Parties Moore, Magnelli, and other qualified aggrieved individuals because they engaged in protected activity, including but not limited to requesting reasonable accommodations and complaining.

275.    Ms. Moore contacted Corizon's corporate headquarters in order to complain about the manner in which she was treated due to her disability and her need for reasonable accommodation.

276.    On the same day she called Corizon's corporate headquarters to complain, her supervisor Mr. Coleman asked her to turn in her badge and was escorted off the facility in front of her coworkers and prison inmates.

277.    She then called Corporate headquarters again to file an EEO complaint because she was escorted off the facility and because she was mistreated after she requested that she have a witness present during her meeting with her supervisor. A corporate official informed her that someone would contact her and let her know that she could return to work.

278.    Her supervisor, Mr. Coleman, called her and asked her to return to work the following day.

279.    After she returned to work, Ms. Moore was ostracized and treated badly by her supervisors. Her supervisors refused to speak to her even if she was standing

with them along with other employees. Ms. Moore felt like she was constantly walking on eggshells and was always worried she would be terminated.

280.    Ms. Magnelli complained to Corizon's HR because her supervisor was requiring her to call in to work every day while she was out on medical leave. She also complained that he was requiring her to indicated on her PTO documents that she was in the hospital. When Ms. Magnelli returned to work her supervisor immediately assigned her increased job duties despite her known medical condition.

281.    On a separate occasion, Ms. Magnelli complained to HR after her supervisor informed her that he could terminate her for leaving her post to go to urgent care. After she complained to HR, Ms. Magnelli's supervisor again assigned her increased job duties. The assigned job duties took a toll on her and exacerbated her medical condition.

282.    After Ms. Magnelli sought a reasonable accommodation, permission to work with medical restrictions, Corizon terminated her employment.

283.    The effect of the practices complained of in the forgoing paragraphs has been to deprive Ms. Moore, Ms. Magnelli, and other similarly situated qualified aggrieved individuals of equal employment opportunities and otherwise adversely affect their status as employees because they engaged in protected activity.

284.    The unlawful employment practices complained of in the foregoing paragraphs are continuous and ongoing.

**FIFTH CLAIM FOR RELIEF**

**Hostile Work Environment**

**Section 102 of the ADA 42 U.S.C.§12112 (a)**

285.    The Commission reasserts and incorporates by reference all of the foregoing paragraphs.

286.    Since at least April 1, 2012, Corizon has violated the ADA by subjecting Charging Parties Moore, Magnelli, Pogue, and other qualified aggrieved individuals to a hostile work environment based on disability and/or because of their need for a

reasonable accommodation in violation of 42 U.S.C.§12112 (a) and **§**102 of the ADA.

287.    Ms. Moore was singled out in a staff meeting when a supervisor mentioned that despite employee's disabilities they were still expected to show up to work. She felt outed as an individual with a disability in front of her coworkers.

288.    Ms. Moore was also routinely assigned attendance points by her supervisors for the days she missed work due to her disability and subsequently called into meetings and asked to sign disciplinary documents regarding those missed days. She informed them that she felt sad that she was being punished for having a heart condition.

289.    Ms. Moore was also denied a promotion because of her disability.

290.    Additionally, after Ms. Moore tried to file an EEO complaint with Corizon's corporate headquarters, Ms. Moore was asked to turn in her badge and was walked out of the facility by her supervisor and in front of her coworkers and prison inmates.

291.    After she tried to file a second EEO complaint with Corizon because she was escorted out of the facility, she was treated negatively by her supervisors who refused to speak to her in public settings.

292.    Ms. Magnelli was asked by her supervisor to call in at 6 a.m. every morning while she was out on sick leave.

293.    Ms. Magnelli was given more strenuous job duties by her supervisor despite her known medical condition.

294.    Ms. Magnelli was moved to a maximum-security facility that required more walking and standing. These additional and more strenuous job duties exacerbated her medical conditions.

295.    After Ms. Pogue requested an accommodation, she was told more than once that she would not be accommodated and that she just had to deal with it.

296.    Ms. Pogue's supervisors regularly pestered her about her doctor's appointments. And when she requested accommodation in order to go to her doctor's

appointments, they denied her requests.

297.   Ms. Pogue was not permitted to switch shifts with her fellow employees in order to go to her doctor's appointments, and her supervisors told her she would not be granted leave from her 3 pm class to attend doctor's appointments even if she put in for FMLA leave.

298.   The policies or practices complained of in the paragraphs above deprived Charging Parties Moore, Magnelli, Pogue and other qualified aggrieved individuals of equal employment opportunities and otherwise adversely affect their status as employees because of their disabilities and/or because of their need for reasonable accommodations.

299.   The unlawful employment practices complained of in the foregoing paragraphs were done with malice or with reckless indifference to the federally protected rights of Ms. Moore, Ms. Magnelli, and the other qualified Aggrieved Individuals.

300.   The unlawful employment practices complained of in the foregoing paragraphs are continuous and ongoing.

## SIXTH CLAIM FOR RELIEF

### Use of Discriminatory Qualification Standards

### 42 U.S.C. §§ 12112(a) and (b)(6)

301.   The Commission reasserts and incorporates by reference all of the foregoing paragraphs.

302.   During the relevant time period, Corizon administered its 30-day leave and FMLA leave policies in conjunction with a 100% healed or no medical restrictions policy or practice that did not allow employees with disabilities to work if they had medical restrictions.

303.   Under Corizon's 100% healed or no medical restrictions policy, employees with disabilities who have exhausted leave under the FMLA or Corizon's 30-day medical leave policy are terminated by Corizon unless they are able to work

fully healed and without restrictions.

304.    Corizon applied these policies in a manner that did not allow for reasonable accommodations.

305.    Corizon applied these policies in a manner that made them serve as qualification standards or selection criteria that screen out or tend to screen out individuals with disabilities and is not job-related and/or consistent with business necessity in violation of Section 102(a) and 102(b)(6) and 42 U.S.C. §§ 12112(a) and (b)(6).

306.    The policies and practices complained of in the foregoing paragraphs deprive Charging Parties McCrehin, Pogue, Moore, Magnelli, McCormick, and other qualified aggrieved individuals of equal employment opportunities and otherwise adversely affect their status as employees because of their disabilities.

307.    The unlawful employment practices complained of in the foregoing paragraphs are continuous and ongoing.

**SEVENTH CLAIM FOR RELIEF**

**Use of Discriminatory Standards, Criteria, or Methods of Administration**

**42 U.S.C. §§ 12112(a) and (b)(3)(A)**

308.    The Commission reasserts and incorporates by reference all of the foregoing paragraphs.

309.    Corizon's application of its 30-day leave, FMLA leave policies, and its 100% healed or no medical restrictions policy or practice has the effect of discrimination on the basis of disability and is not job related and consistent with business necessity, in violation of 42 U.S.C. §§ 12112(a) and 12112(b)(3)(A).

310.    During the relevant time period, Corizon maintained rigid FMLA and 30-day medical leave policies that did not provide for reasonable accommodation, such as, for example, extended leave, if an employee was unable to return after exhaustion of leave under Corizon's leave policies.

311.    Under Corizon's 100% healed or no medical restrictions policy or

practice, employees with disabilities who have exhausted leave under the FMLA or Corizon's 30-day medical leave policy are terminated if they have medical restrictions when the leave is exhausted.

312.    Corizon's application of these policies only permits employees to return to work if they are able to work full, unrestricted duty.

313.    Corizon's 100% healed or no medical restrictions policy discriminates against and/or has a discriminatory effect on individuals with disabilities.

314.    These policies serve as a standard, criteria, or method of administration that has the effect of discrimination on the basis of disability.

315.    The effect of the policies and practices complained of in the foregoing paragraphs has been to deprive Charging Parties McCrehin, Pogue, Moore, Magnelli, McCormick and the other qualified aggrieved individuals of equal employment opportunities and otherwise adversely affect their status as employees because of their disabilities.

316.    The unlawful employment practices complained of in the foregoing paragraphs are continuous and ongoing.

## PRAYER FOR RELIEF

Wherefore, the Commission respectfully requests that this Court:

A.    Permanently enjoin Corizon, its officers, successors, assigns, and all persons in active concert or participation with it, from discriminating and retaliating against employees because of a disability or their need for a reasonable accommodation.

B.    Order Corizon, its officers, successors, assigns, and all persons in active concert or participation with it, to institute and carry out policies, practices, and programs which provide equal employment opportunities for qualified individuals with disabilities, and which eradicate the effects of its past and present unlawful employment practices.

C.    Order Corizon to engage in the interactive process with its employees

with medical restrictions in order for Corizon and its employees to discover potential reasonable accommodations that may be available for Corizon's employees, including but not limited to extended leave, reassignment and light duty positions.

D.      Order Corizon to cease using its rigid and inflexible leave policy in a manner that denies qualified individuals with disabilities reasonable accommodations.

E.      Order Corizon to discontinue its practice of discharging employees with disabilities in lieu of providing reasonable accommodations.

F.      Order Corizon to cease using its rigid and inflexible leave policy as a qualification standard, employment test or other selection criteria that screens out or tends to screen out individuals with disabilities.

G.      Order Corizon to cease administering its rigid and inflexible leave policy using a method that is not job-related and consistent with business necessity and that has the effect of discriminating on the basis of disability by denying qualified individuals with disabilities reasonable accommodations, and instead terminating their employment.

H.      Order Corizon to cease using its 100% healed or no medical restrictions policy as a qualification standard, employment test or other selection criteria that screens out or tends to screen out individuals with disabilities and is not job-related and consistent with business necessity.

I.      Order Corizon to cease administering its 100% healed or no medical restrictions policy, a method that is not job-related and consistent with business necessity and that has the effect of discriminating on the basis of disability by denying qualified individuals with disabilities reasonable accommodations, and instead terminating their employment.

J.      Order Corizon to make whole Charging Party Elizabeth McCrehin, Ann Pogue, Nicole Moore, Linda Magnelli, Barbara McCormick and other qualified aggrieved individuals with disabilities by providing appropriate backpay and lost benefits with prejudgment interest, in amounts to be determined at trial, and other

affirmative relief necessary to eradicate the effects of its unlawful employment practices, including but not limited to the reinstatement and promotions as appropriate of Charging Parties Elizabeth McCrehin, Ann Pogue, Nicole Moore, Linda Magnelli, Barbara McCormick and other qualified aggrieved individuals, or front pay in lieu of reinstatement.

K.    Order Corizon to make whole Charging Elizabeth McCrehin, Ann Pogue, Nicole Moore, Linda Magnelli, Barbara McCormick and other qualified aggrieved individuals with disabilities by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described in the paragraphs above, including but not limited to relocation expenses, job search expenses, and medical expenses, in amounts to be determined at trial.

L.    Order Corizon to make whole Charging Parties Elizabeth McCrehin, Ann Pogue, Nicole Moore, Linda Magnelli, Barbara McCormick and other qualified aggrieved individuals with disabilities by providing compensation for past and future nonpecuniary losses resulting from the unlawful employment practices described in the paragraphs above, including but not limited to emotional pain, suffering, inconvenience, loss of enjoyment of life, humiliation, loss of credit standing, and stress, in amounts to be determined at trial.

M.    Order Corizon to pay Charging Parties Elizabeth McCrehin, Ann Pogue, Nicole Moore, Linda Magnelli, Barbara McCormick and other qualified aggrieved individuals with disabilities punitive damages for its intentional, malicious or reckless conduct described in the paragraphs above, in amounts to be determined at trial.

N.    Grant such other and further relief as this Court deems necessary and proper in the public interest.

O.    Award the Commission its costs of this action.

## **JURY TRIAL DEMAND**

The Commission requests a jury trial on all questions of fact raised by its Complaint.

RESPECTFULLY SUBMITTED this 18th day of September 2018.

JAMES L. LEE
Acting General Counsel

GWENDOLYN REAMS
Associate General Counsel

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION
131 M Street NE
Washington, DC 20507

MARY JO O'NEILL
Regional Attorney

JAMES P. DRISCOLL-MACEACHRON
Supervisory Trial Attorney

/s/Wasan Awad
WASAN A. AWAD
Trial Attorney

/s/William R. Hobson
WILLIAM R. HOBSON
Trial Attorney

/s/Benjamin Price
BENJAMIN PRICE
Trial Attorney

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION
Phoenix District Office
3300 N. Central Ave., Ste. 690
Phoenix, AZ 85012

Attorneys for Plaintiff